**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald Mogaka, | No. CV-24-01977-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Physician's Management/Employee Leasing Company LLC, | |
| Defendant. | |

The Court now considers Defendant Physician's Management Employee Leasing Company, LLC's ("PMPH") Motion for Summary Judgment (Doc. 43).  The Court **grants in part and denies in part** Defendant's Motion for the following reasons.

## I.     BACKGROUND

This case concerns Plaintiff Dr. Ronald Mogaka's termination from PMPH.  (Doc. 1 at 3 ¶ 14, 4 ¶ 21.)  Plaintiff was PMPH's Director of Nursing ("DON") from January 2023 until his December 2023 termination.  (*Id.*)  As relevant to this case, Plaintiff is Kenyan and has colorectal cancer.  (*Id.* at 2 ¶¶ 6–7.)  The Complaint alleges as follows.

In May 2023, PMPH CEO Stephen Scott instructed Plaintiff "to fire all of PMPH's supervisors because one . . . was 'too old' and that the others had accents."  (*Id.* at 3 ¶ 15.)  Plaintiff refused.  (*Id.*)  Thereafter, Scott excluded Plaintiff from meetings, did not answer Plaintiff's emails, and belittled Plaintiff to his co-workers.  (*Id.* at 4 ¶ 16.)

Plaintiff reported Scott's retaliatory behavior to human resources and PMPH COO Emily Moheb.  (*Id.* ¶ 17.)  Upon learning of this, Scott told Plaintiff: "You reported me.  It

will come back to bite you." (*Id.*)  Scott then reduced Plaintiff's salary without explanation. (*Id.* ¶ 18.)

Plaintiff also alleges that he informed Scott of his cancer and requested time to go to the doctor.  (*Id.* ¶ 19.)  Scott denied Plaintiff's request on two occasions and told Plaintiff that "he was needed at work and that he needed to schedule his days on day that would not interfere with his job responsibilities and denied Dr. Mogaka time off to for his doctor appointment."  (*Id.* ¶ 20.)  Ultimately, Plaintiff was terminated.  (*Id.* ¶ 21.)

Plaintiff thus asserts the following claims: failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; wrongful termination under the ADA; retaliation under Title VII of the Civil Rights Act of 1964; and retaliation under 42 U.S.C. § 1981.  (Doc. 1 at 1.)

## II.      LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by showing "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in the nonmovant's favor.  *Anderson*, 477 U.S. at 255.  Additionally, the Court does not make

credibility determinations or weigh the evidence. *Id.* The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case. *Id.*

The burden initially falls on the movant to demonstrate the basis for a motion for summary judgment and "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has the burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.    DISCUSSION

The Court notes that overlapping legal principles apply to Plaintiff's claims. Specifically, Plaintiff's retaliation claims and his wrongful termination claim proceed under the three-step *McDonnel Douglas* framework.[1] *See Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1035, 1039 (D. Ariz. 2014) (applying the *McDonnel Douglas* framework to Title VII and ADA claims); *see also Norman v. Clark Cnty. Dep't of Juv. Just. Servs.*, 244 F. Supp. 3d 1085, 1091 (D. Nev. 2017) ("The legal principles governing a section 1981 retaliation claim and a Title VII retaliation claim are the same.").

---

[1] The Court recognizes that ADA failure to accommodate claims and wrongful termination claims are often, "from a practical standpoint, the same" "where the consequence of the alleged failure to accommodate results in disparate treatment." *McGinn v. Hawaii Symphony Orchestra*, 727 F. Supp. 3d 915, 942 (D. Haw. 2024) (citation modified). Still, these claims are "analytically distinct." *See Johnson v. Bd. of Trs. of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011). Although there is some overlap between Plaintiff's ADA claims, the Court finds that the claims here warrant separate analysis. Thus, the Court does not expressly evaluate Plaintiff's failure to accommodate claim under this tripart framework.

Under the *McDonnel Douglas* framework, "a plaintiff must first establish a prima facie case of retaliation" or disability discrimination. *See Cheeks*, 22 F. Supp. 3d at 1035, 1039. "If the plaintiff establishes a prima facie case . . . the defendant has the burden of articulating a legitimate, non-retaliatory reason for its action." *Id.* at 1035. If the defendant carries their burden, "the plaintiff bears the ultimate burden of providing evidence that the defendant's reason is" pretextual. *Id.* (citation modified).

**A. ADA Wrongful Termination**

The Court begins with Plaintiff's wrongful termination claim. The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." § 12112(a).

1. *Prima Facie Case*

To state a prima facie case of wrongful termination, Plaintiff must show that: (1) he is disabled; (2) he was qualified for the position; and (3) he suffered an adverse employment action because of his disability. *Fleming v. IASIS Healthcare Corp.*, 151 F. Supp. 3d 1043, 1052 (D. Ariz. 2015). PMPH only contests the third element. Under the third element, Plaintiff must demonstrate that he was fired because of his colorectal cancer. As to this showing, "[t]he requisite degree of proof is minimal, and [Plaintiff] need only offer evidence which gives rise to an inference of unlawful discrimination." *Id.* (citation modified).

The Court finds, and PMPH does not materially dispute, that Plaintiff has met his minimal burden. In short, Plaintiff contends that discrimination can be inferred because he was terminated just two weeks after he requested leave to attend a medical appointment. (Doc. 52 at 12.) The Court agrees that this satisfies Plaintiff's step-one burden, particularly "given the low threshold required at this first step of the *McDonnell Douglas* framework." Therefore, "the Court assumes without deciding that [Plaintiff] has established a prima facie case." *See Fleming*, 151 F. Supp. 3d at 1052.

2. *Nondiscriminatory Reasons*

The burden now shifts to PMPH "to articulate a legitimate nondiscriminatory reason for firing" Plaintiff. *Id.* PMPH argues that "Plaintiff's termination was based on performance deficiencies tied to accreditation and regulatory compliance." (Doc. 44 at 7–8.) PMPH notes that in November 2023, it "received an unfavorable Joint Commission survey, and on December 19, 2023, the Joint Commission issued a Preliminary Denial of Accreditation" ("PDA"). (*Id.* at 8.) Upon receiving the PDA, "[l]eadership, including COO Moheb, consulted shortly thereafter and decided to terminate Plaintiff, consistent with company policy allowing bypass of progressive steps for egregious failures." (*Id.*) PMPH notes that Moheb and PMPH Human Resource Director Ruth Stone "confirmed the termination was for overall poor performance, with Joint Commission issues considered as part of—but not the sole basis for—the decision." (*Id.*) PMPH continues, noting that Plaintiff's "termination paperwork reflects this same rationale, citing DON responsibilities for regulatory compliance and supervision rather than solely accreditation loss." (*Id.*) PMPH also points out that Plaintiff was replaced by Juanita Cruz, an African-American woman. (Doc. 46 at 4 ¶ 31.) Accordingly, PMPH meets their step-2 burden.

3. *Pretext*

"The burden now shifts back to [Plaintiff] to demonstrate that these articulated reasons are merely a pretext for discrimination." *Fleming*, 151 F. Supp. 3d at 1053. "The evidentiary threshold is higher at this step than at the prima facie case, as [Plaintiff] must produce specific, substantial evidence of pretext." *Id.* (citation modified). Plaintiff primarily argues that the Joint Commission's PDA was not the true reason for his termination. The Court considers Plaintiff's arguments in turn.

Many of Plaintiff's arguments miss their mark. To start, Plaintiff argues that "[n]o one ever explained to [him] that if the hospital lost accreditation he would be fired for it." (Doc 51 at 4.) The Court questions whether such an explanation would need to be provided to Plaintiff. If PMPH lost its accreditation due to a director's conduct, it would seem

reasonable for the director to assume his job would be at risk.

Plaintiff also notes that PMPH "had been receiving poor joint commission evaluations since 2020 due to the providers." (*Id.*)  Plaintiff relies on a transcript of a conversation between Scott, Stone, and himself from an August 2023 meeting.  (*Id.*)  Although the Court questions Plaintiff's characterization of the transcript, even accepting Plaintiff's characterization as true, it does little to establish pretext.  First, it is unclear that the poor evaluations were related to the PDA.  Second, Plaintiff does not establish how PMPH receiving poor evaluations prior to his employment demonstrates pretext.

Plaintiff points out that the "lost [sic] of the Joint Commission license was just an excuse because Defendant was able to get other accreditation." (Doc. 51 at 4.)  Plaintiff relies on Moheb's deposition for this contention.  (*Id.*)  Moheb testified that Plaintiff was replaced with Cruz and that "with her help" PMPH was able to "get the department right and get another accrediting." (Doc. 51-2 at 17.)  In the Court's view, this argument weighs against Plaintiff's position.  Moheb testified that PMPH was issued a PDA because of Plaintiff, and once Plaintiff was terminated, his replacement was able to get another accreditation. (*Id.* at 16–17.)  PMPH being able to get another accreditation after Plaintiff's termination seems to corroborate PMPH's position.

Nevertheless, Plaintiff points out that PMPH was forced to get another accreditation because "Cruz was not able to get the Joint Commission licensure back" and Cruz was not fired.  (Doc. 51 at 4.)  This assertion, even if true, does not show pretext.  It is PMPH's position that Plaintiff was fired, at least in part, due to the PDA.  Even if it is true that Cruz unsuccessfully appealed the PDA, this does not seem to be the same as engaging in conduct which contributed to the PDA in the first instance.

Despite the foregoing arguments, Plaintiff otherwise makes a compelling showing that PMPH's reasons for termination are pretextual.  For instance, Plaintiff contends that his work performance did not contribute to the PDA.  (Doc. 52 at 7.)  Plaintiff avers that the Joint Commission's Preliminary Accreditation Report "does not document a lack of care in nursing services" despite the claim that PMPH "was on preliminary denial because

of the lack of care in nursing services." (*Id.*) Although Moheb testified that "[t]he PDA was ultimately given for a majority of lack of care in nursing services, which is [Plaintiff's] department that he oversaw," there is no evidence corroborating this assertion. (Doc. 51-2 at 8.) Indeed, the available evidence seems to cut against Moheb's testimony.

Plaintiff attaches the Joint Commission's Preliminary Accreditation Report. (Doc. 51-4 at 32.) The report lists "Requirements for Improvement," which the Court presumes were the same items which ultimately led to the PDA.[2] (*Id.* at 37.) Plaintiff seems to be correct in that the Report does not list "nursing services" or anything facially related to PMPH's nurses as requiring improvement. (*See id.* at 37–43.) The Court finds that this strongly weighs in Plaintiff's favor in establishing pretext. Although PMPH argues that the "Joint Commission issues [were] part of—but not the sole basis for—the decision" to terminate Plaintiff, (Doc. 44 at 8), PMPH does not demonstrate that Plaintiff was responsible for any of the Requirements for Improvement.

This leaves PMPH's assertion that Plaintiff was terminated "for overall poor performance." (*Id.*) Plaintiff asserts that PMPH "had no other issues with Plaintiff's performance and had no history of write ups in his personnel file." (Doc. 51 at 5.) Plaintiff goes on to note that if he was fired for poor performance, there "should have been progressive discipline with evidence of prior write-ups in [his] personnel file." (Doc. 51 at 5.) Indeed, Plaintiff points to PMPH's disciplinary procedure policy which provides for a structure of "progressive discipline" which outlines a disciplinary structuring that begins with counseling, then verbal warnings, then written warnings, then suspension, then termination. (Doc. 51-4 at 3–5.) However, the policy provides that these steps are only "general guidelines" and may be suspended or discharged for "major offense[s]." (*Id.* at 2–3.) Nevertheless, Plaintiff argues, and PMPH does not materially refute, that "[t]here

---

[2]    Both parties erroneously assume that this Court has foreknowledge of hospital accreditations and PMPH's internal processes. It does not. As noted, the Motion and its briefing use industry specific jargon and acronyms that are unknown to this Court. For example, neither party explains what the Joint Commission is, what a Preliminary Accreditation Report is, or what a PDA is. The parties leave this Court to discern these terms based purely on context. As relevant here, the parties do not explain the connection between the Preliminary Accreditation Report and the PDA. The Court was not provided a copy of the PDA.

[is] no documentation of any warnings in [Plaintiff's] personnel file." (Doc, 52 at 15.)  As noted, PMPH argues that Plaintiff's "termination paperwork reflects this same rationale, citing DON responsibilities for regulatory compliance and supervision rather than solely accreditation loss." (Doc. 44 at 8.)  However, the Court was not provided with a copy of this termination paperwork.[3]

Although PMPH also recognizes that it may "bypass . . . progressive steps for egregious failures," it does not point to any egregious failure aside from Plaintiff's alleged contribution to the PDA.  (Doc. 44 at 8.)  Thus, if the PDA is the only reason justifying bypassing progressive discipline, Plaintiff has presented enough evidence to create a triable fact this is pretextual given that issues with PMPH's nursing department are not mentioned in the Joint Commission's Preliminary Accreditation Report.  However, if there are reasons other than the PDA justifying bypassing progressive discipline, PMPH fails to point this Court to any discrete examples of such.

The Court finds, viewing the evidence in the light most favorable to Plaintiff, that Plaintiff has presented enough evidence to demonstrate that PMPH's stated reasons for his termination were pretextual.  In sum, PMPH contends that Plaintiff was fired based on the PDA and other performance deficiencies.  PMPH does not provide, much less point to evidence corroborating, what these other performance deficiencies are.  Plaintiff also presents sufficient evidence to create a triable issue as to whether he was responsible for the PDA.  Accordingly, the Court denies summary judgment on the wrongful termination

---

[3] PMPH asserts that "the Disciplinary Action Notice identified failures to meet DON expectations, including regulatory compliance with 'i.e., Joint Commission,' ISDH, and DMHA, along with deficiencies in staff supervision, meetings, and quality improvement processes." (Doc. 44 at 4.)  Presumably this Disciplinary Action Notice is the termination paperwork PMPH refers to.  Although PMPH's Motion is generally lacking, it is especially so on this point.  The Court assumes this Disciplinary Action Notice was issued to Plaintiff upon his termination or is otherwise related to the "Joint Commission survey."  However, PMPH does not provide this Court with a copy of the notice or otherwise describe *any* salient facts regarding the notice.  To boot, PMPH does not define the acronyms "ISDH" or "DMHA."   Instead, PMPH directs this Court to Stone's deposition transcript—particularly, page 47 lines 8 through 15. (Id.)  PMPH proceeds to provide this Court with a copy of that transcript which is out of order, contains duplicate pages, and does not include page 47. (*See* Doc. 45-3 at 1–16.)  Plaintiff provides this Court with page 47 of Stone's deposition transcript.  However, this portion of the transcript does little to assist this Court in appreciating the import of the Disciplinary Action Notice.

claim.

## B. Retaliation Claims

The Court next considers Plaintiff's retaliation claims under Title VII and § 1981. "Title VII prohibits employers from discriminating against an employee because that employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)). Again, these claims proceed under the *McDonnel Douglas* framework.

"To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Id.* Again, "the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cheeks*, 22 F. Supp. 3d at 1029–30 (citation modified). Plaintiff contends he engaged in protected activity when he refused to fire PMPH supervisors because of their age and accents. (Doc. 1 at 3 ¶ 15.) As a result, Plaintiff contends that Scott interfered with his work, his pay was reduced, and he was ultimately terminated. (Doc. 52 at 13–15.)

PMPH's attempted refutation of Plaintiff's prima facie case is scant. PMPH does not challenge whether Plaintiff engaged in a protected activity. Regarding the second element of the prima facie case, PMPH's only argument is that "Plaintiff's complaints of reduced communication and strained interactions fall into the category of 'petty slights or minor annoyances' the Supreme Court held are not actionable." (Doc. 44 at 9.) While this may be true, the Ninth Circuit has adopted a broad standard of what constitutes "an adverse employment action." *See Ray*, 217 F.3d at 1243. Moreover, Plaintiff's claim is otherwise predicated on his termination and pay reduction, which certainly constitute adverse employment actions. Finally, PMPH does not materially argue that Plaintiff fails to

establish the third element of his prima facie case. Instead, PMPH merely points out in a header that Plaintiff "cannot show . . . but-for causation." (Doc. 44 at 9.) However, PMPH does not materially substantiate this point in the body of its Motion. Accordingly, given the minimal standard, and a dearth of legal analysis from PMPH, the court assumes Plaintiff establishes a prima facie case of retaliation.

Thus, the Court considers PMPH's non-discriminatory reasons for the adverse employment actions. PMPH reiterates the same arguments raised above regarding Plaintiff's termination. (Doc. 44 at 9.) Again, this argument satisfies PMPH's step-two burden; however, for the reasons stated, Plaintiff has presented enough evidence to create a triable issue as to pretext.

This leaves Plaintiff's reduction in pay. In June 2023, Plaintiff's pay was reduced from $160,000 to $140,000. (Doc. 46 at 1 ¶ 4.) PMPH argues that Plaintiff was only paid $160,000 due to "an administrative error" and that the pay reduction was really a correction "consistent with intended compensation for the position" based on "established scales." (Doc. 44 at 2.) Accepting PMPH's proffered non-discriminatory rationale behind the pay reduction, Plaintiff presents enough evidence to create a triable issue as to pretext.

Plaintiff notes that he refused to fire the supervisors in May 2023 and his pay was reduced in June 2023. *See Fleming*, 151 F. Supp. 3d at 1055 (noting that the timing of an adverse employment action in relation to an adverse employment action can support a retaliation claim). The timing also tends to establish pretext given that Plaintiff had been on the payroll for approximately six months before PMPH decided to rectify its administrative error. Plaintiff then argues that he was told "that the reason he changed his salary was because the Company did not have the funds to pay him 160k per year." (Doc. 51 at 2.) In support, Plaintiff cites to a "[t]ranscript of conversation with CEO Stephen Scott, HR Ruth Stone, and [Plaintiff] re pay discrepancies." (*Id.*; Doc. 51-1 at 1.) In this transcript, Scott states he will "give [Plaintiff] an explanation of why it was cut . . . . Because this company is bleeding money." (Doc. 51-3 at 56.) This cuts against PMPH's assertion that Plaintiff's pay was reduced based on an administrative error.

Plaintiff also notes that he was not issued a Personal Action Form ("PAF") which PMPH issues when there is a salary change.  (Doc. 51 at 2.)  In sum, this evidence, viewed in the light most favorable to Plaintiff, is sufficient to create a triable issue as to pretext. Accordingly, the Court denies summary judgment as to Plaintiff's Title VII claim.

Regarding Plaintiff's § 1981 claim, PMPH argues that § 1981 "protects against race-based discrimination and retaliation for opposing race discrimination, but it does not cover complaints based solely on national origin." (Doc. 44 at 9.)  Thus "Plaintiff's alleged opposition concerned age and accents, not race" which "is fatal to his § 1981 claim at the threshold." (*Id.*)  Plaintiff does not materially respond to this argument.

PMPH's point is well taken—§ 1981 only applies to race-based discrimination. *See Villodas v. HealthSouth Corp.*, 338 F. Supp. 2d 1096, 1103 (9th Cir. 2004).  Plaintiff does not contend that his § 1981 claim is based on race.  Indeed, "[a]ccent and national origin are obviously inextricably intertwined in many cases." *Conti v. Corp. Servs. Grp., Inc.*, No. C12-245RAJ, 2013 WL 2297140 (W.D. Wash. May 24, 2013).  Accordingly, the Court grants summary judgment on Plaintiff's § 1981 claim, which fails as a matter of law.

### C. ADA Failure to Accommodate

Finally, the Court considers Plaintiff's disability discrimination claims under Title I of the ADA.  Plaintiff claims that PMPH failed to accommodate his colorectal cancer by denying his requests for time off.  (Doc. 1 at 1; Doc. 52 at 7–11.)

As noted, the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." § 12112(a).  Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." § 12112(b)(5)(A).

Failure to accommodate claims require a claimant to prove: "(1) he is disabled"; "(2) he is a qualified individual able to perform the essential functions of the job"; and "(3) he suffered an adverse employment action because of his disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003).  Again, the first two elements are undisputed.

"Once an employer becomes aware of the need for accommodation, that employer

has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).[4]  At a general level, "[a] leave of absence for medical treatment may be a reasonable accommodation under the ADA." *Id.* at 1135.  This is true even where it is not "certain or even likely" that a leave of absence will be "successful."  *Id.* at 1136.

Plaintiff, in his Declaration, testifies that on August 28, 2023, he "informed Scott that [he] suffered from a medical condition that required [him] to take time off to go to the doctor" but "PMPH did not inquire further of [Plaintiff] and failed to engage into an interactive process." (Doc. 15-1 at 5 ¶ 10.)  Plaintiff goes on to testify that PMPH did not make further inquiries or otherwise apprise Plaintiff of his ADA rights.  (*Id.*)  That same day, Scott met with Plaintiff and told him hat he "was needed at work" and "needed to schedule [his] doctor appointments on days that would not interfere with [his] job responsibilities."  (*Id.* at 6 ¶ 11.)  Plaintiff then testifies that "as a result, [he] was denied time off for a follow-up treatment in June of 2024."[5]  (*Id.* ¶ 10.)  Plaintiff also testifies that he "was denied time off to attend . . . his doctor appointment on December 13, 2023."  (*Id.* ¶ 13.)

Frankly, it is unclear on what basis PMPH seeks dismissal of Plaintiff's failure to accommodate claim.  In an attempt to make sense of its Motion on this point, the Court addresses PMPH's discrete arguments in turn.  To start, PMPH points out that Plaintiff "provided no medical documentation" of his colorectal cancer. (Doc. 44 at 4.) It is unclear why PMPH makes this point.  First, PMPH does not dispute Plaintiff's diagnosis.  (Doc. 46 at 3 ¶ 19.)  Second, PMPH does not point to any authority suggesting that Plaintiff must corroborate his diagnosis with medical documentation.

PMPH also points out that Plaintiff "admitted he never submitted a written ADA request."  (*Id.*)  It is unclear why PMPH makes this point.  Accommodation requests do not

---

[4]  Employers are not required to provide accommodations if it would pose an undue hardship.  § 12112(b)(5)(A).  PMPH makes no such contention here.
[5]  The Court assumes Plaintiff made this request before his December 2023 termination.

have to be in writing.  *See Valdez v. Delta Elec. & Air LLC*, No. CV-20-01981-PHX-DWL, 2022 WL 3213265, at *5 n.3 (D. Ariz. Aug. 9, 2022) (citing EEOC Enforcement Guidance No. 915.002, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada (last visited Apr. 21, 2022)).  PMPH does not point to any authority suggesting otherwise.

PMPH, relying on Plaintiff's deposition testimony, asserts that that Plaintiff "identifies December 13, 2023 as the only date he claims denial of accommodation."  (Doc. 44 at 4.)  This assertion is intellectually dishonest.  Plaintiff, in his deposition, clearly testified that he requested accommodations at "other times" but that he could not recall exact dates.  (Doc. 45-1 at 58.)  The Court was able to locate this portion of the transcript despite PMPH providing this Court with a deposition transcript that is not in order—a particularly frustrating error given that the transcript is over ninety pages.  However, even assuming PMPH's assertion is true, it has failed to direct the Court to any authority establishing that a failure to accommodate claim predicated on failure to grant leave to attend medical appointments requires a claimant to be denied leave on multiple occasions.

PMPH also contends that Plaintiff "was allowed to sit and rest as needed."  (Doc. 44 at 8.)  Although PMPH does not expound on this point, the Court assumes PMPH raises this point to suggest that it fulfilled its ADA obligation "to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations."  *Humphrey*, 239 F.3d at 1137.  However, this Court is unwilling to find, as a matter of law, that Plaintiff being allowed to "sit and rest" is a reasonable accommodation when Plaintiff originally requested leave to attend medical appointments.

Finally, PMPH argues that Plaintiff "acknowledged he had PTO available on December 13, 2023 but came to work after Scott asked if he was coming in."  (Doc. 44 at 4, 8.)  Although PMPH does not make this point expressly, the Court assumes PMPH argues that Plaintiff's disability was accommodated because he could have used PTO in lieu of being provided leave to attend medical appointments.  Although this argument may

have merit, there is evidence suggesting that Plaintiff was discouraged from using PTO. Plaintiff, in his deposition, testified that he did not use PTO to attend a December 2023 medical appointment because "[Scott] told [him] to come to work." (Doc. 45-1 at 56.)

Accordingly, the Court denies summary judgment on the failure to accommodate claim.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED granting in part and denying in part** Defendant's Motion (Doc. 43). The Court grants Defendant's Motion with regard to Plaintiff's § 1981 claim, but denies Defendant's Motion as to Plaintiff's remaining claims.

**IT IS FURTHER ORDERED dismissing** Plaintiff's § 1981 claim with prejudice.

Dated this 15th day of May, 2026.

Honorable Susan M. Brnovich
United States District Judge

- 14 -